UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| AMERICAN AUTOMOBILE | ) | |
| INSURANCE COMPANY, | ) | |
| as assignee of FRED AND | ) | |
| ADRIENNE KOSTECKI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:11CV00305 AGF |
| | ) | |
| OMEGA FLEX, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Plaintiff American Automobile Insurance Company ("Plaintiff") brings this

action against Defendant Omega Flex, Inc. ("Defendant") to recover funds Plaintiff paid

its insureds, Fred and Adrienne Kostecki, following a fire at the Kostecki residence in

High Ridge, Missouri.  Plaintiff asserts that TracPipe, Corrugated Stainless Steel Tubing

("CSST"), manufactured and sold by Defendant, and used to transport propane into the

home, was defective and caused the fire.  On this basis, Plaintiff alleges liability for three

claims: negligent product design; strict liability, under defective product and failure to

warn theories; and breach of warranty arising from the use of the TracPipe.

Now before the Court are the parties' cross motions for summary judgment and

motions to strike the opinion testimony of expert witnesses pursuant to *Daubert v.*

*Merrell Dow Pharmaceuticals., Inc*., 509 U.S. 579 (1993).  The parties have fully briefed

the motions and the Court heard oral argument.  For the reasons set forth below,

Defendant's motion to exclude the opinion testimony of Dr. Thomas Eagar is granted in part and denied in part; Plaintiff's motion to exclude the testimony of Dr. Harri Kytomaa is denied; Defendant's motion for summary judgment is granted in part and denied in part; and Plaintiff's motion for summary judgment is denied.

## I.  Background

Upon review of the record, the exhibits and affidavits attached thereto, the Court finds the following facts, which are undisputed, except where noted.

In 2001, Fred and Adrienne Kostecki contracted with HIW, Inc. ("HIW"), to build a house at 3460 Whitby Lane, High Ridge, Missouri ("the Kostecki residence".) Unidentified contractors retained by HIW installed TracPipe CSST to transport propane to and within the residence.  HIW declared bankruptcy shortly before it finished building the Kostecki residence.

The Omega Flex 2001 TracPipe Design Guide and Installation Instructions ("2001 D&I Guide"), applicable at the time of the Kostecki construction, provides "general instructions" for the "installation and design" of a TracPipe CSST system.  (Doc. No. 56-4, at 3.)  The 2001 D&I Guide provides that only a "qualified person who has been trained or otherwise qualified" to install the TracPipe may do so, and states that the "general instructions" for design and installation are to be "used in conjunction with state and local building codes."  *Id.*  On the same page the 2001 D&I Guide states in bold, underlined typeface that "**Local codes will take precedence in the event of a conflict between this guide and the local code**."  *Id.*  In the next sentence, the 2001 D&I Guide

provides that '[i]n the absence of local codes installation must be in accordance with the NATIONAL FUEL GAS CODE. . . .  *Id.*

The first page of the 2001 D&I Guide contains a heading reading "WARNINGS" followed by the words "Limitations of Manual" and a black box labeled "WARNING!" stating that "[t]he installation instructions and applicable local codes must be strictly followed."  *Id.*  Several pages of specific installation instructions and an illustration follow, describing, among other things, the bonding of the TracPipe to the household grounding electrode during installation.  *Id.* at 4-20.  This section of the 2001 D&I Guide concludes with a warning that "bonding is a requirement of the National Electrical Code, which must be followed for all gas piping materials including CSST."  *Id.* at 22.  The 2001 D&I Guide does not include any representations regarding TracPipe's merchantability or fitness for a particular purpose.  *Id.*

It is undisputed that during installation the TracPipe in the Kostecki residence was not bonded with a bonding clamp and bonding wire of 6 AWG thickness as described in the 2001 D&I Guide.  Mr. Ronald Juergens and Mr. Mark Goodsong, Plaintiff's electrical engineering experts, testified at their depositions that the Kostecki installation did not have a bonding clamp that was attached to the CSST or a bonding wire of 6 AWG thicknesses for the product.  Instead, a three prong plug was used for grounding in accordance with the National Electric Code ("NEC") requirements referenced in the 2001 D&I Guide.[1]

---

[1]  Juergens testified at his deposition that Omega Flex's TracPipe Design Guide and Installation Instructions includes a "diagram that was depicted in the bonding section of

Defendant's Suggested Price List provides that Defendant "warrants to the original owner at the original installation site that the [TracPipe] will be free from defects in material or workmanship for one year from the date of installation."  (Doc. No. 56-16, at 4.)  The Suggested Price List further states that this limited warranty "does not apply if the Product has been subjected to misuse or neglect, has been accidentally or intentionally damaged, has not been installed, maintained or operated in accordance with the TracPipe Design and Installation Guide, or has been altered or modified in any way." *Id.*  The Suggested Price List also states in bolded, upper case lettering that the limited warranty "is in lieu of all other warranties, either express or implied, and all such other warranties, including without limitation implied warranties of merchantability or fitness for a particular purpose, are hereby disclaimed and excluded from this limited warranty." *Id.*

Defendant provides its Suggested Price List to direct purchasers of TracPipe.  The record does not indicate whether HIW or its subcontractor purchased the TracPipe from a dealer or directly from Defendant.  There is no evidence that the Kosteckis received or

---

the guide" that showed "a bonding clamp that was attached to the CSST with instructions to use a bonding wire of 6 AWG thickness for the product."  (Juergens Depo. Doc. No. 56-8, at 15:4-12).  Juergens further testified that the Kostecki installation did not have a "bonding clamp that was attached to the CSST" or "a bonding wire of 6 AWG thickness for the product."  *Id.* at 15:8-15.  Plaintiff's electrical engineering expert, Mark Goodson, testified that the CSST system in the Kostecki house was not bonded to the household grounding electrode with a "dedicated bonding wire and bonding clamp."  The system was grounded with a three prong plug.

read the Suggested Price List accompanying the TracPipe used in their home or that they received any other documents that might give rise to a warranty.

The Kosteckis moved into the residence in 2002, after it passed a local building code inspection.  Thereafter, they obtained a home owners' insurance policy from Plaintiff.  The policy period extended from May 7, 2009, to May 7, 2010, and covered up to $2,169,800 in damage to the Kosteckis' property ($1,142,000 for dwelling, $228,400 for other structures, and $799,400 for personal property), and $1,020,000 in liability and medical payments to others ($1,000,000 in personal liability for each occurrence and $10,000 for each person for medical payments to others).

The Policy provides in pertinent part:

Definitions

    *                                *                              *

C.  15.  Occurrence means:

        a. Under Coverage For Damage To Your Property:  accidental loss and damage to covered property which occurs during the policy period and is caused by one or more causes of loss we cover….

  Property Losses Not Covered

    *                                *                              *

B.  1.  We will not pay for loss caused by or resulting from any of the following.  However, any ensuing loss not excluded in this policy is covered

    *                                *                              *

        e. Inherent vice, hidden or latent defect or any quality in property that causes it to damage or destroy itself

&ast;                                        &ast;                                        &ast;

For the causes of loss described above, except collapse, we do cover resulting loss or damage to covered property unless the resulting loss is itself caused by a cause of loss described in Property Losses Not Covered.

   1.  We do not cover loss caused by any of the following

      &ast;                                        &ast;                                        &ast;

     c. faulty, inadequate or defective . . .

         (2)  design, specifications, workmanship, repair, construction, renovation, and remodeling, grading, compaction;

         (3)  materials used in repair, construction, renovation or remodeling;

&ast;                                        &ast;                                        &ast;

Policy Conditions

&ast;                                        &ast;                                        &ast;

I.  Subrogation

&ast;                                        &ast;                                        &ast;

   2.  If we require assignment, an insured will sign and deliver all related papers and cooperate with us.

   3.  In the event of loss which we believe may be collectible from others, we may pay in the form of a loan to be repaid out of any recoveries from others.  You will cooperate in every way possible to assist in such recovery from others and we shall, at our expense, take over your rights against others to the extent of your payment.

Pursuant to a one-page document entitled "Assignment and Subrogation Receipt,"

Plaintiff bought an interest in the claims in this suit by paying the Kosteckis 50% of their

alleged losses.  The Receipt also provides that the Kosteckis retain a pro-rata uninsured interest in any recovery Plaintiff obtains.

Defendant sells TracPipe to wholesalers or distributors, who then sell to licensed installers.  At the time of purchase, installers are required to produce a card evidencing that they have been trained in TracPipe installation.  Installers obtain training cards by attending a training class conducted by a company representative, regional manager, manufacturer's reps, or a person at the wholesale level that has received training.

It is undisputed that Defendant's distributors are not supposed to sell TracPipe to anyone who does not have a training card, but Defendant has no program in place to assure that this requirement is followed or to inform its certified installers of changes in its installation guidelines.  It is also undisputed that installation instructions are not provided to certified installers at the point of purchase and new versions of D&I Guides are not provided to certified installers as they are updated.

On April 30, 2010, a thunderstorm moved through the High Ridge area, accompanied by rain and lightning.  A fire occurred at the Kostecki home during this lightning storm.  As a result of the fire the Kostecki property suffered severe heat, smoke, and water damage.

David Smith, Defendant's testifying fire investigator, has opined that the fire originated directly below the study where it was first observed and that the cause of the fire cannot be determined.  Smith's scene investigator conducted a burn pattern analysis indicating that the fire originated in or around the floor truss system between a bedroom on the lower level and the first floor study.  The fire spread through the flooring system in

this area, causing the floor in the study to collapse into the basement.  Robert Wysong, one of Plaintiff's experts, identified the same area as the origin of the fire.  It is undisputed that in the aftermath of the fire, two 2x5 mm perforations were found in the run of TracPipe CSST located in the area of the fire's origin.

## II.  *Daubert* Motions

Each party has moved to strike the opinion testimony of one of the other's experts, contending that their respective opinions should be stricken as outside the scope of the witness' expertise and/or unsupported by a reliable methodology as required under Federal Rule of Evidence 702[2] and the Supreme Court's decision in *Daubert,* 509 U.S. 579.

### A.  <u>Applicable Law</u>

Rule 702 sets forth standards for expert opinion testimony and is designed to ensure that all scientific testimony is both reliable and relevant and reflects the standards set forth in the United States Supreme Court decisions in *Daubert*, 509 U.S. at 579, and

---

[2]  A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

*Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999). Under *Daubert,* courts act as gate-keepers to ensure that the proffered expert testimony is both relevant and reliable. *Daubert*, 509 U.S. at 592. Proffered expert testimony should be excluded if it is speculative or conjectural. *Barrett v. Rhodia*, *Inc.*, 606 F.3d 975, 980 (8th Cir. 2010); *Junk v. Terminix Int'l Co.*, 628 F.3d 439, 448 (8th Cir. 2010) (holding that "[s]peculative testimony should not be admitted"). Similarly, expert opinions lacking a factual basis or based on speculation or conjecture should not be permitted. *Barrett*, 606 F.3d at 980. To satisfy the reliability requirement, the party offering the expert testimony must show by a preponderance of the evidence both that the expert is qualified to render the opinion and that the methodology underlying his conclusions is scientifically valid. *Id.*

The United States Supreme Court has emphasized that the test for reliability is flexible, and that a trial judge may, but need not, consider the specific factors identified in *Daubert*: "whether a theory or technique can be and has been tested; whether it has been subjected to peer review and publication; the known or potential rate of error; and whether it is generally accepted in the relevant discipline." *Kuhn v. Wyeth, Inc.*, 686 F.3d 618, 625 (8th Cir. 2012) (citing *Kuhmo Tire,* 526 U.S. at 149-50). In addition, "[e]xpert evidence may be excluded if a court determines "that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* at 625 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). Neither "*Daubert* [n]or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Id.*

In the specific context of fire causation, the Eighth Circuit has advised that expert opinions may be found reliable when based solely upon observations and experience. *See, e.g.*, *Shuck v. CNH Am., LLC*, 498 F.3d 868, 874-75 (8th Cir. 2007) (concluding that expert opinion based upon observation and expertise that engine failure caused a fire reliable because experts for both parties relied on this methodology and the engine components were too damaged to be tested); *Hickerson v. Pride Mobility Prods. Corp.*, 470 F.3d 1252, 1257 (8th Cir. 2006) (holding that a fire causation expert's opinion was admissible where the methodology involved no testing but the application of specialized knowledge to observations of a fire scene); *see also Kumho Tire*, 526 U.S. at 137 (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience").

If testing to establish fire causation is performed it "must be appropriate and must analytically prove the expert's hypothesis." *Presley v. Lakewood Eng'g & Mfg. Co.*, 553 F.3d 638, 646-47 (8th Cir. 2009) (holding that metallurgical tests and flammability tests were insufficient to establish ignition or spread, and that opinions regarding ignition and spread should be excluded as speculative when based upon the witness' supposition).

Under Federal Rule of Evidence 704(a), expert testimony may embrace an ultimate issue in a case, but "'courts must guard against invading the province of the jury on a question which the jury [is] entirely capable of answering without the benefit of expert opinion.'" *Rottlund Co. v. Pinnacle Corp.*, 452 F.3d 726, 732 (8th Cir. 2006) (quoting *Robertson v. Norton Co.*, 148 F.3d 905, 908 (8th Cir.1998)).  Expert opinions

also may run afoul of Rule 403 because their potential prejudicial effect may outweigh their probative value.  *See* Fed. R. Evid. 403.

### B. Opinions of Thomas Eagar, Ph.D.

Plaintiff's expert, Thomas Eagar, Ph.D., is a metallurgist and arc physicist, and a frequent litigation consultant in the area of metallurgy and metal failure.  Eagar is to offer expert opinion testimony with respect to three issues:  causation, *i.e.*, whether TracPipe caused the Kostecki fire; the efficacy of bonding to improve the safety of TracPipe; and whether TracPipe's design, including warnings and instructions was defective.  In Eagar's report, he opines that TracPipe was defective, that bonding would not have prevented the fire, and that Defendant's warnings and instructions were inadequate to warn of the danger posed by TracPipe.

With respect to causation, Eagar opines that a lightning-generated electrical arc perforated the TracPipe, releasing propane gas that ignited and in turn caused the fire.  This opinion is based on a metallurgic analysis of the voltage and duration of a hypothetical lightning strike; Eagar's asserted ability to discern whether the holes in the CSST are the result of lightning, or arcing from the household electrical system or other cause; and simulations of fire ignition consistent with Eagar's hypothesis.  On the basis of tests he performed, Eagar claims that perforations like the ones found here can in turn result in fires, but he has acknowledged various flaws in those tests.

In support of its *Daubert* motion, Defendant argues that Eagar's causation opinions are outside the scope of his expertise because he is not a specialist in fire causation.  In addition, Defendant asserts that Eagar's causation opinion is premised on a

series of steps unsupported by peer-reviewed scientific evidence or a reliable methodology.  Defendant further contends that Eagar's opinion that an indirect lightning strike was sufficient to perforate TracPipe is based on flawed testing, and also inconsistent with his own testimony in other cases regarding his expertise.[3]  Finally, Defendant asserts that Eagar's opinions with respect to defective design and warnings are outside the scope of his expertise and inconsistent with his own testimony regarding his expertise.[4]

Defendant objects to the reliability of Eagar's opinion that the energy generated by an indirect lightning strike was sufficient to perforate the TracPipe and cause the fire, because his report contains no data regarding indirect lightning strikes.  Similarly, Defendant objects to Eagar's testimony that he can discern whether the holes in the CSST were caused by lightning, because Eagar also states that metallurgical analysis alone cannot offer such answers.

---

[3] *See, e.g.*, Eagar Dep. (*Sauer*) at 27:15-22 ("I am not an expert on lightning. I do not profess to be an expert on lightning."); Eagar Dep. (*Holes*) at 30:11-19 ("I am not an expert on lightning."); Eagar Dep. (*Becnel*) at 84:3-19 ("I have not pretended to be a lightening [sic] expert here. I am a metallurgi[st] and am an arc physicist, but I am not specifically a lightening [sic] expert."); Eagar testified at his deposition in the *Karlin* case that he does "not hold [him]self out as an origin and cause expert."  Eagar testified at his deposition in the *Sauer* case that he does "not hold [him]self out as an expert in the design of corrugated stainless steel systems" or in the installation of CSST.

[4] Eagar testified at his deposition in the *Sauer* case that he does "not hold [him]self out as an expert in the design of corrugated stainless steel systems" or in the installation of CSST.  Eagar Dep. (*Sauer*) at 197:6-22.  Eagar testified at his deposition in the *Grimm* case that he does not "hold [him]self out as an expert in warnings."  Eagar Dep. (*Grimm*) at 82:24-83:6).

Defendant also argues that Eagar offers no basis from which the Court could conclude that his credentials and training as a metallurgist and arc physicist qualify him to offer opinions regarding product design and the efficacy of bonding and warnings. Defendant notes that, in the context of other litigation involving TracPipe, Eagar has testified that he is not an expert with respect to product design or warnings, and that another federal court excluded his opinions with respect to these issues. *See Cincinnati Ins. Co. v. Omega Flex, Inc*., No. 3:10-CV-00670M, 2013 WL 2120322 (W.D. Ky. May 15, 2013).

Pursuant to Rule 702, a court's primary consideration as to the admission of expert testimony is whether such testimony will assist the trier of fact.  Upon review of the record before it, the Court concludes that Plaintiff has not shown by a preponderance of the evidence that Eagar can qualify as an expert with respect to product design and product warnings to provide a reliable basis for his opinions on these issues.  Eagar has specifically disavowed such expertise and his areas of expertise bear no more than a remote relationship to product design and warnings.  In the absence of specific expertise on these issues, his testimony will provide little assistance to the jury. *Cincinnati Ins. Co.*, 2013 WL 2120322, at *1 (refusing to reconsider a previous order holding that "Dr. Eagar may not opine generally as to the standard of care of manufacturers or specifically as to Omega Flex's conduct . . . [because s]uch opinions are outside his field of expertise, metallurgy."); *see also Barrett*, 606 F.3d at 980.

In addition, Eagar's proposed testimony on the issue of the adequacy of the warnings presents a real risk of invading the province of the jury by directing its

determination on an ultimate issue.  *See Rottlund*, 452 F.3d at 732; *Robertson,* 148 F.3d at 908 (affirming exclusion of expert's opinion in light of his lack of qualifications regarding warnings and his failure to systematically consider the problems inherent in devising a warning).  Moreover, the proposed testimony as to design and warnings may run afoul of Fed. R. Evid. 403.  The jury might afford it greater weight than warranted because "[t]he shroud of his [irrelevant] expertise [in another area] will likely elevate his opinion above a mere observation to a legal conclusion."  *Cincinnati Ins. Co.*, 2013 WL 2120322, at *2; *Hayes v. MTD Prod., Inc.*, 518 F. Supp. 2d 898, 901 (W.D. Ky. 2007) (holding that legal conclusions are reserved for the jury).  For these reasons, Eagar may not offer opinion testimony relating to product design and warnings.

With respect to Eagar's opinions regarding fire causation and the efficacy of bonding, the Court concludes that his metallurgical and arc physics expertise is closely and logically related to these issues and qualifies him to opine with respect to these issues.  The fire causation and bonding questions here hinge upon the possible effects of an electrical arc on a metal, CSST, and the measures required to alter the conductivity of that metal.  Therefore, the Court is satisfied that Eagar's claimed areas of expertise, as established by a preponderance of the evidence on the record, make him a reliable witness with respect to these issues.

Defendant asserts that *Pro Service Automotive, L.L.C. v. Lenan Corp*., 469 F.3d 1210 (8th Cir. 2006), requires exclusion of Eagar's testimony regarding fire causation and bonding because "there is too great an analytical gap between the data and his opinion."  469 F.3d at 1215-16.  But the holding in *Pro Service* is readily distinguishable.

There, the proposed expert offered a causation opinion without performing any testing, and "only vague theorizing based on general principles." *Id.* By contrast, Eagar has performed tests relating the response of CSST to various voltage levels and to the ignition of gas at the resulting temperatures. Defendant's argument that Eagar's opinion is unreliable because it believes he drew the wrong conclusion from scientifically accepted testing goes to the weight and credibility of his testimony, not its reliability. *Compare Pro Serv. Auto., L.L.C.*, 469 F. 3d at 12 *with White v. Cooper Indus., Inc.,* No. Civ. 06-4272-KES, 2009 WL 234347, *6-7 (D.S.D., Jan. 29, 2009).

Similarly, the other flaws Defendant identifies in Eagar's data, theories and testing methods go to the weight rather than the admissibility of that evidence and should not be excluded on this basis. *See Kudabeck v. Kroger Co.*, 338 F.3d 856, 862 (8th Cir. 2003). Defendant will have the opportunity on cross-examination to challenge Eagar's opinions and the underlying justification for them. *Id.* (holding that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence"). Therefore, the Court concludes that Eagar may testify as to the matters within his areas of expertise – metallurgy and arc physics – and may offer his opinion regarding fire causation in relation to metallurgy and arc physics. Testimony outside of these areas related to product design and warnings will be excluded.

### C.  Opinions of Harri Kytomaa, Ph.D.

Defendant's expert, Harri Kytomaa, Ph.D., is a mechanical engineer and "fire causation specialist."  He is to testify with respect to fire causation, but the thrust of his opinion is to demonstrate the flaws in Eagar's causation hypothesis.

Kytomaa asserts that the energy generated by an indirect lightning strike is insufficient to perforate the TracPipe CSST and ignite escaping propane.  He asserts that propane gas escaping from the perforations in the CSST could not have been ignited by this lightning arcing event and that even if such ignition occurred, the force of the propane flowing through the perforations would have extinguished any spark or fire.

Kytomaa opines that an arcing event energized the CSST but did not melt the CSST at this time.  He contends that energy from the lightning strike arced off the CSST to another unknown conductive material and ignited some non-specific combustible material, such as wood joists, gypsum board, sawdust or dander.  This unidentified "first fuel" ignited and sustained the fire, which spread.  Kytomaa claims that as the fire spread it attacked an aluminum feeder wire that was extremely close to the CSST, burning away the insulation on the electrical wiring, and triggering a second electrical arc between the CSST and the wiring.  Kytomaa posits that this second arc, powered by the home's electrical system, was capable of perforating the CSST, causing gas to escape into the on-going fire.

Plaintiff seeks to exclude certain of Kytomaa's opinions as speculative, and not based on physical evidence, appropriate testing or reliable principles, and methods.

Plaintiff also asserts that Kytomaa's opinions are not derived from any recognized methodology and directly contradict accepted scientific principles.

Applying the principles set forth above, the Court concludes that Kytomaa's testimony with respect to causation should be permitted.  His expertise in fire causation and electrical engineering has been duly demonstrated and his opinions regarding the cause of the fire are supported by scientific literature and the testing he performed.

Plaintiff's assertions regarding the reliability of Kytomaa's methods and testing are also best addressed on cross examination because they go to the weight rather than the reliability of his opinion.  Plaintiff's objections are largely conclusory and unsupported by examples from Kytomaa's report or scientific authority challenging his methods or data.  Therefore, upon review of the report, the Court cannot say that Kytomaa's theory is unsupported by scientific methodology.  Indeed, a review of his report indicates numerous references to peer reviewed literature as a basis for his data and tests.  Therefore Kytomaa's testimony with respect to the cause of the fire will be permitted.

## III.  Motions for Summary Judgment

Pursuant to Federal Rule of Civil Procedure 56(c), the district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In the face of a properly supported summary judgment motion, the non-moving party must "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S.

242, 250 (1986); Fed. R. Civ. P. 56(e)(2).  That is, the non-movant must "do more than

simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*

*Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986).  "If the nonmoving

party fails to produce such evidence, summary judgment is proper."  *Olson v. Pennzoil*

*Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

  "By its terms, Rule 56 provides that the mere existence of some alleged factual

dispute between the parties will not defeat an otherwise properly supported motion for

judgment; the requirement is that there be no genuine issue of material fact."  *Anderson*,

477 U.S. at 247-48.  Material facts are those "that might affect the outcome of the suit

under the governing law," and a genuine material fact is one such that "a reasonable jury

could return a verdict for the nonmoving party."  *Id*.  Further, if the nonmoving party has

failed to "make a showing sufficient to establish the existence of an element essential to

that party's case, . . . there can be 'no genuine issue as to any material fact,' since a

complete failure of proof concerning an essential element of the nonmoving party's case

necessarily renders all other facts immaterial."  *Celotex Corp.*, 477 U.S. at 322-23.

  A. **Plaintiff's Motion for Summary Judgment**

  Plaintiff moves for summary judgment asserting that because the jury in a prior

suit, *Tincher v. Omega Flex, Inc.*, No. 2008-00974CA (Pa. Commw. Oct. 20, 2010),

determined that the TracPipe CSST at issue there was defective, Defendant is collaterally

estopped from asserting otherwise in this lawsuit.

  In *Tincher*, Terrence and Judith Tincher owned a residence in Chester County,

Pennsylvania.  The Tincher residence was constructed in 1999 and equipped with CSST

manufactured by Defendant under the brand name TracPipe, which was used to transport natural gas to appliances within the home.  On June 20, 2007, a thunderstorm moved through the Chester County area, accompanied by rain and lightning.  During the storm, a lightning discharge struck at or near the residence; a fire began, and the residence was severely damaged by heat, smoke and water as a result of the fire.  The Tinchers filed suit against Defendant and following an eight-day trial that commenced on October 11, 2010, a jury of twelve found Defendant's TracPipe CSST product defective.  A judgment against Defendant arising out of the Tincher fire was filed in the Chester County, Pennsylvania, Court of Common Pleas.

Under the doctrine of collateral estoppel, or issue preclusion, once a court has decided an issue of fact or law necessary to its judgment, that decision precludes relitigation of the issue in a suit in a different cause of action involving the same parties or privities.  *Kinsky v. 154 Land Co.*, 371 S.W.3d 108 (Mo. Ct. App. 2012) (citing *San Remo Hotel, L.P., v. City & Cnty. of San Francisco, Cal.,* 545 U.S. 323, 336 n.16 (2005)); *see also Shahan v. Shahan*, 988 S.W.2d 529, 532-33 (Mo. 1999).  Collateral estoppel may be applied if:  (1) the issue decided in the first action is identical to the issue in the second; (2) the prior litigation resulted in a judgment on the merits; (3) the party to be estopped was a party or in privity with a party to the prior adjudication; and (4) the party to the prior adjudication had a full and fair opportunity to litigate the issue in the prior suit.  *Shahan,* 988 S.W. 2d at 532-33.

Defendant opposes the application of offensive collateral estoppel and upon consideration of the points set forth below, the Court concludes that it should not be

applied here.  First, the issues in *Tincher* and this case, while similar, are not identical and the factual differences between the two counsel against the application of collateral estoppel.  In addition, Pennsylvania law, as applied in *Tincher*, differs from Missouri law regarding principles of product liability and failure to warn.  Further, the presiding judge in *Tincher* specifically opined that the verdict should not be deemed to have preclusive effect in other cases involving TracPipe and Omega Flex.  Finally, Plaintiff offers no authority for the proposition that one jury verdict against a defendant forever decides the issue of that defendant's liability with respect to all other similar circumstances involving other plaintiffs in other jurisdictions.  When asked at the hearing whether such authority exists, Plaintiff admitted that none did.  For these reasons, the Court will deny Plaintiff's motion for summary judgment on the basis of offensive collateral estoppel.

### B. Defendant's Motion for Summary Judgment

1. Evidence of Causation

Defendant first asserts that Plaintiff's claims fail in their entirety because it has not produced admissible evidence of (1) causation, (2) defective design, or (3) inadequate warnings.  Missouri law requires a Plaintiff to establish "causation" in all product liability claims – *i.e.*, that the defendant's product caused the Plaintiff's injury.  *See Pro Serv. Auto.,* 469 F.3d at 1214.

In light of the Court's ruling on the *Daubert* motion relating to Eagar's testimony, Defendant's assertion that Plaintiff has produced no admissible causation evidence is simply incorrect.  In addition, Plaintiff has disclosed four other experts whose expertise relates not only to the origin and cause of the fire but also to product design and the

efficacy of bonding and warnings.  These witnesses will presumably be available to offer testimony on these issues.  Therefore, the Court cannot accept Defendant's contention that there is no admissible evidence with respect to the essential issues of causation, design, and warnings.  As such, Defendant's motion for summary judgment on this ground fails.

     2.  <u>Voluntary Payment Doctrine</u>

     Defendant also moves for summary judgment contending that the plain language of the insurance policy expressly excludes coverage for the Kosteckis' loss and that Plaintiff's voluntary payment to them despite this exclusion precludes Plaintiff's subrogation claim under Missouri law.

     In support of this position, Defendant references the language of the policy in Section B.1.e that excludes recovery for "loss caused by or resulting from . . . inherent vice, hidden or latent defect or any quality in property that causes it to damage or destroy itself."  Defendant also contends that Section B.3.c, which provides that Plaintiff does "not cover loss caused by". . . "faulty, inadequate or defective" . . ."design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction," or "materials used in repair, construction, renovation or remodeling," excludes coverage for the Kosteckis' loss.  Defendant asserts that Plaintiff's allegations regarding the defective nature of the TracPipe fit these exclusions, and therefore, that Plaintiff had no obligation under the policy to cover the Kosteckis' loss.

     Plaintiff responds that it properly extended coverage pursuant to policy language defining an "occurrence," because the policy language does not expressly exclude from

coverage a loss arising from a lightning strike and resultant fire.  Plaintiff further asserts

that that even if the "inherent vice or defective materials" provision applies to the

Kostseckis' loss, the policy as quoted above provides coverage for damage resulting from

"inherent vice or defective materials" unless the resulting loss is itself caused by an

"inherent vice or defective materials."  (Doc. No. 56, at 1.)  Plaintiff contends that even if

it had been known or presumed that the TracPipe was defective, Plaintiff would have

been required to cover the resulting loss caused by fire, smoke, and water damage and

therefore, that its payment under the policy was not voluntary.  In the alternative, Plaintiff

asserts that it is an assignee rather than a subrogee of its insureds and therefore, that the

voluntary payment doctrine does not apply here.

    The voluntary payment doctrine, '"well established [under Missouri law, provides]

that a person who voluntarily pays money with full knowledge of all the facts in the case,

and in the absence of fraud and duress, cannot recover it back, though the payment is

made without a sufficient consideration, and under protest.'"  *Huch v. Charter

Commc'ns, Inc.*, 290 S.W.3d 721, 726 (Mo. 2009) (quoting *Am. Motorists Ins. Co. v.

Schrock*, 447 S.W.2d 809, 812 (Mo. Ct. App. 1969)).  The doctrine applies to subrogation

claims under insurance policies.  But where there is a dispute regarding coverage, courts

have held that an insurer who pays its insured may still bring a subrogation action if it

made its payment in good faith as a result of a valid dispute over unclear policy language

or relevant facts.  *See id.*; *Shrock*, 447 S.W.2d at 812.; *see also Childers v. E. Foam

Prods., Inc.*, 94 F. R. D. 53, 56-57 (N.D. Ga. 1982) (stating that '"where an insurer makes

payments for only part of rather than all of its insured's loss, the insurer is subrogated *pro*

*tanto* to the right of its insured and the insured retains that part of the claim in excess of the insurer's payment.  A necessary corollary is that the insurer retains a part interest in its insured's claim against the tortfeasor, to the extent that the insurer has compensated the insured for his loss.'") (quoting *Lindsey v. Samoluk*, 219 S.E.2d 464, 466 (1975), *rev'd on other grounds*, 223 S.E.2d 147 (1976)).

With respect to the language of the policy, the Court notes that the parties' differing interpretations belie Defendant's assertion that the plain language of the policy excludes coverage and renders Plaintiff's payment voluntary.  In addition, each of the alternative policy interpretations Plaintiff suggests is plausible and required it to cover the Kosteckis' loss.  Moreover, there is no indication that Plaintiff did not act in good faith when it provided coverage for the loss.  Finally, even if the Court were to assume that the "inherent vice or defect" exclusion applied, Defendant has not demonstrated that Plaintiff's coverage of the Kosteckis' loss would be voluntary, because there is no indication in the record that when payment was made Plaintiff had full knowledge of the facts relating to the alleged role of TracPipe in causing the loss.  *Id.*

The Court concludes that the alternative bases for coverage offered by Plaintiff are reasonable and therefore, that Plaintiff had a contractual obligation to indemnify its insureds under the policy.  In addition, the payment was made in the absence of the full knowledge regarding the fire's causation.  Therefore, Plaintiff did not "volunteer" or make payment for a loss it was not obliged to cover, and the voluntary payment doctrine does not apply to extinguish Plaintiff's right to subrogation or assignment under the policy.  *See Keisker v. Farmer*, 90 S.W.3d 71, 74 (Mo. 2002) (holding that the doctrine

will extinguish a subrogation claim when the subrogee is "a mere volunteer who pays the debt of another without any assignment or agreement for subrogation, and who is under no legal obligation to make the payment, and is not compelled to do so for the preservation of any rights or property of his own")

In light of this determination, the Court need not reach the issue of whether the agreement between Plaintiff and its insureds is in the nature of a subrogation or an assignment. Accordingly, Defendant's motion for summary judgment on the basis of the voluntary payment doctrine also is denied.

3. Bonding and Unintended Use

Defendant moves for summary judgment on Plaintiff's negligent design and strict liability product defect claims asserting that because the undisputed facts demonstrate that the TracPipe was not properly installed at the Kostecki residence, Plaintiff cannot show as required that the product was put to a "reasonably anticipated use." *Keener v. Dayton Elec. Mfg. Co.*, 445 S.W.2d 362, 366 (Mo. 1969). Defendant further asserts that the failure of the Kosteckis' contractor to bond and ground the TracPipe system as required by the product instructions constitutes a misuse of the product that was not reasonably foreseeable and precludes any finding of proximate causation on either of these claims.

Plaintiff responds that summary judgment is not warranted on the negligent design and strict liability product defect claims because there are material questions of fact regarding the clarity and efficacy of the instructions for the use of TracPipe. Specifically, Plaintiff notes that the question of whether the NEC-approved grounding method used in

the Kostecki home, a three pronged plug and a 14 GW wire, complies with the instructions in the 2001 D&I Guide, or constitutes a reasonably foreseeable use of the product.

With respect to the strict liability product defect claim, Missouri law requires Plaintiff to prove that at the time of sale, the product was in a defective condition when put to a "reasonably anticipated use," and that the Plaintiff was damaged as a result of the product's defective condition.  *Keener,* 445 S.W.2d at 366; *Menz v. New Holland N. Am., Inc.*, 460 F. Supp. 2d 1050, 1054 (E.D. Mo. 2006).  "[A] supplier is not liable when it delivers a product in a safe condition but subsequent mishandling renders the product defective."  *Stanger v. Smith & Nephew, Inc.*, 401 F. Supp. 2d 974, 979 (E.D. Mo. 2005).

Upon review of the record the Court agrees that there is a material dispute of fact with respect to the clarity of the installation instructions, whether the grounding method used could be said to comply with the 2001 D&I Guide instructions, and whether TracPipe was unreasonably dangerous or defective even when bonded according to the instructions in the 2001 D&I Guide instructions.  Therefore, this portion of Defendant's motion for summary judgment will be denied.  *Peitzmeier v. Hennessy Indus., Inc.*, 97 F.3d 293, 298-99 (8th Cir. 1996) (affirming summary judgment where accident was caused by mechanic's mishandling of tire, not design defect).

4.   Adequacy of Warnings

Defendant also moves for summary judgment on Plaintiff's failure-to-warn strict liability claim.  Defendant asserts that the claim fails because Plaintiff has produced no evidence demonstrating that TracPipe's warning was inadequate, that the Kosteckis'

- 25 -

contractor lacked relevant information, or that the allegedly inadequate warning directly "caused" the damage or would have altered the Kostecki contractor's behavior.

Plaintiff responds that the efficacy of bonding to prevent an incident such as this one is disputed, and therefore that the question of whether heeding the warning would have prevented the fire is disputed.

Under Missouri law, "[t]he elements of a cause of action for strict liability under a failure to warn theory are as follows: (1) defendant sold the product in question in the course of his business; (2) the product was unreasonably dangerous at the time of sale when used as reasonably anticipated without knowledge of its characteristics; (3) defendant did not give adequate warning of the danger; (4) the product was used in a reasonably anticipated manner; and (5) plaintiff was damaged as a direct result of the product being sold without an adequate warning." *Cole v. Goodyear Tire & Rubber Co.*, 967 S.W.2d 176, 183 (Mo. Ct. App. 1998) (internal citation omitted).

In addition, there are two distinct causation requirements for a failure to warn claim:  "(1) the product for which there was no warning must have caused plaintiff's injuries; and (2) plaintiff must show a warning would have altered his behavior." *Id.* at 184 (citing *Arnold v. Ingersoll-Rand Co.*, 834 S.W.2d 192, 194 (Mo. 1992)).  Summary judgment properly is entered if either causation element is lacking.  *Mothershead v. Greenbriar Country Club, Inc.,* 994 S.W.2d 80, 89 (Mo. Ct. App. 1999) (citation omitted).

With respect to the second element, in order to overcome the presumption that warnings are heeded, there must be "sufficient evidence from which a jury could find

[that] the [recipient of the warning] did not already know of the specific danger involved." *Menz v. New Holland N. Am., Inc.*, 507 F.3d 1107, 1112 (8th Cir. 2007); *see also Arnold*, 834 S.W.2d at 194 (holding that "[a]s causation is a required element of the plaintiff's case [and] the burden is on plaintiff to show that lack of knowledge"). "Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous." RESTATEMENT (SECOND) OF TORTS § 402A.

Finally, in a case such as this, involving technical and complex processes whose properties are outside the common knowledge or experience of a jury, "[a] failure to warn claim requires admissible expert testimony that additional or other warnings might have altered the behavior of the plaintiff." *Davidson v. Besser Co.,* 70 F. Supp. 2d 1020, 1023 (E.D. Mo. 1999) (citation omitted); s*ee also Bryant v. Laiko Int'l Co., Inc.,* No.1:05CV00161, 2006 WL 2788520 at *10 (E.D. Mo. Sept. 26, 2006).

Plaintiff has not identified the contractor responsible for the TracPipe installation in the Kostecki home, and the Plaintiff's expert, Eagar, will not be permitted to testify with respect to the adequacy of the warnings contained in the 2001 D&I Guide. Because the installing contractor has not been identified, there is no evidence on the record from which the jury could conclude that the installer did not already know of the danger associated with TracPipe or that a warning different than that included in the 2001 D&I Guide would have altered the installer's actions. *See Mothershead,* 994 S.W.2d at 89. Therefore, the Court concludes that Defendant's motion for summary judgment with

respect to the strict liability failure to warn claim should be granted because Plaintiff has offered no evidence with respect to this required element of its claim. *See, e.g., Gallatin v. Delta Int'l Mach. Corp.,* No. 05-4416-CV-C-NKL, 2007 WL 188449, at *3 (W.D. Mo. Jan. 23, 2007) (granting summary judgment where the plaintiff produced no evidence that "his injuries were proximately caused by any defect in or lack of warning on [the defendant's] table saw as opposed to his own misuse of the equipment"); *Menz*, 507 F.3d at 1112 (affirming a grant of summary judgment where machine operator was aware of dangers associated with tractor).

Without this critical, threshold information, Plaintiff's failure-to-warn claim fails as a matter of law. *Morton v. Homelite, Inc.*, 183 F.R.D. 657, 659 (W.D. Mo. 1998) (holding that plaintiff was precluded from pursuing the failure-to-warn claim, where plaintiff presented no evidence that "a warning would have communicated any additional information").

5. Express and Implied Warranty Claims

Defendant asserts that Plaintiff's express and implied warranty claims are barred by Defendant's explicit disclaimer of warranties in the Suggested Price List and Missouri's four year statute of limitations. Plaintiff asserts that the warranty disclaimer in the Suggested Price List is ineffective, because there is no evidence that the Kosteckis ever received or read the Suggested Price List or that it ever became part of a contract between Defendant and the Kosteckis. Neither party asserts a basis for express or implied warranty arising from a document other than the Suggested Price List.

It is undisputed that Defendant's Suggested Price List contained language stating that the TracPipe was accompanied by a limited one-year warranty that expired before the Kostecki fire; expressly disclaimed consequential damages of the sort Plaintiff seeks here; expressly voided the limited warranty in situations where the product was subjected to "misuse or neglect" or was not "installed, maintained or operated in accordance with the TracPipe Design and Installation Guide"; and expressly disclaimed all warranties other than the limited one-year warranty, whether express or implied.  *See* Defendant's Suggested Price List.  However, Plaintiff correctly asserts that there is no evidence before the Court that the Suggested Price List was ever presented to the Kosteckis, much less that it constitutes a contract between the Kosteckis and Defendant.

Under Missouri law, a document like the Suggested Price List, such as " a brochure, catalog, or advertisement," may constitute part of an express warranty.  *Hope v. Nissan N. Am., Inc.*, 353 S.W.3d 68, 86 (Mo. Ct. App. 2011).  However, a party claiming protection under such an express warranty must have seen and the catalog, advertisement, or brochure or other document.  *Id.*; *In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, 687 F. Supp. 2d 897, 906-07 (W.D. Mo. 2009) (collecting case law for the proposition that for a representation to become part of the bargain, it must be known to all parties to that bargain and if a party is not aware of the statement, that party cannot claim it was part of the bargain).  In light of this principle, the Court concludes that Defendant's motion for summary judgment on the express warranty claims should be granted because there is no evidence in the record that the Kosteckis received or read the

Suggested Price List or that it became part of any contract with them.  *Hope*, 353 S.W.3d at 86.

Even if the Court were to presume that the Kosteckis had read the Suggested Price List, the disclaimer of warranties in that document is effective to bar a claim based on express warranty.  *Verbrugge v. ABC Seamless Steel Siding, Inc.*, 157 S.W.3d 298, (Mo. Ct. App. 2005); *Karr-Bick Kitchens & Bath, Inc. v. Gemini Coatings, Inc.,* 932 S.W.2d 877, 879 (Mo. Ct. App. 1996).  A manufacturer may expressly disclaim liability via prominent markings on packaging, brochures, or other marketing materials.  *Groppel Co., Inc. v. U.S. Gypsum Co*., 616 S.W.2d 49, 61 n. 13 (Mo. Ct. App.1981).  The language of the Suggested Price List effectively disclaimed Defendant's liability for any express warranties which were made to the Kosteckis and hence to Plaintiff.  *Id.*

Turning to the implied warranty claim, Mo. Rev. Stat. § 400.2–314 creates an implied warranty of merchantability, under which the seller warrants that goods are at least "fit for the ordinary purposes for which such goods are used."  *Hope*, 353 S.W.3d at 89-90 (Mo. Ct. App. 2011).  To prove a claim for breach of implied warranty of merchantability in Missouri, a plaintiff must show:

> (1)  That a merchant sold goods, (2) which were not "merchantable" at the time of the sale, (3) injury and damages to the plaintiff or his property (4) which were caused proximately or in fact by the defective nature of the goods, and (5) notice to the seller of the injury.

*Id.* (internal quotation omitted).

Assuming without deciding that these elements could be established here, the question becomes who may claim the protection of that warranty and what is the effect of

its disclaimer.  A manufacturer's disclaimer of warranties differs conceptually from a reseller's disclaimer of warranty.  *Karr-Bick Kitchens & Bath, Inc.*, 932 S.W.2d at 879. "When the manufacturer sells the goods to a dealer who resells the goods to the ultimate purchaser, the latter cannot sue the manufacturer if the manufacturer ha[s] made a [legally effective ] disclaimer of warranties."  *Id*.  The manufacturer's disclaimer of warranties does not "run with the goods" and does not protect any subsequent seller from liability under an implied warranty.  *Id.*

Defendant contends and the Court agrees that it effectively disclaimed any implied warranty that would have attended its sale of the TracPipe to a dealer or installer and therefore that no implied warranty extended to the Kosteckis.  Under Missouri law, Defendant's implied warranty extends to the dealer or installer who purchased from Defendant but it does not extend to the Kosteckis and hence to Plaintiff.  *Id.*

In addition*,* even if the implied warranty did extend to the subsequent purchasers, the language of the Suggested Price List effectively disclaims the implied warranty under Missouri law.  *Id.*  The disclaimer language complies with the requirements of Mo. Rev. Stat. § 400.2A–214(2) as it was in writing, was conspicuous, and mentions merchantability.  *See, e.g., Graham Const. Serv., Inc. v. Hammer & Steel, Inc.*, No.:11CV1316JCH, 2012 WL5438994, at *7 (E.D. Mo. Nov.7, 2012) (dismissing implied warranty claim based on disclaimer in lease agreement.)

Thus, Plaintiff's claims regarding implied warranties fail as a matter of law, and Defendant's motion for summary judgment on this ground is granted.  In light of this determination, the Court need not reach the statute of limitations question.

Case: 4:11-cv-00305-AGF   Doc. #:  96   Filed: 06/11/13   Page: 32 of 32 PageID #: 4758

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's motion to exclude the testimony of Plaintiff's expert, Dr. Thomas Eagar, is **GRANTED in part** and **DENIED in part**. (Doc. No. 51.)

**IT IS FURTHER ORDERED** that Defendant's motion for summary judgment (Doc. No. 55) is **GRANTED in part** and **DENIED in part**, as follows:

1.  Defendant's motion for summary judgment is **DENIED** with respect to Plaintiff's claims for negligent design and strict liability, defective product theory.

2.  Defendant's motion for summary judgment is **GRANTED** with respect to Plaintiff's claims for strict liability, failure to warn theory, and breach of express and implied warranties.

**IT IS FURTHER ORDERED** that Plaintiff's motion for summary judgment is **DENIED**.  (Doc. No. 59.)

**IT IS FURTHER ORDERED** that Plaintiff's motion to exclude the testimony of Defendant's expert, Dr. Harri Kytomaa, is **DENIED**.  (Doc. No. 63.)


_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 11th day of June, 2013.

- 32 -